John William PHILLIPS and Jacqueline Phillips, for themselves and all others similarly situated, Plaintiffs–Appellants,

v.

Mary Helen ANDRESS et al., Defendants–Appellees.

No. 78–1845.

United States Court of Appeals, Fifth Circuit. Unit B

Jan. 22, 1981.

Edward Still, Birmingham, Ala., Neil Bradley, Laughlin McDonald, Atlanta, Ga., for plaintiffs–appellants.

Ray, Oliver & Barrett, Martin Ray, Tuscaloosa, Ala., for defendants–appellees.

---

Before HILL, KRAVITCH and THOMAS A. CLARK, Circuit Judges.

THOMAS A. CLARK, Circuit Judge:

Our court is requested again[1] to review Alabama's school board election procedures and decide whether electors residing in a city having its own school board are entitled to vote in an election to determine members of the county school board. We review our jurisdiction, our precedents, and the Alabama statutory scheme providing for school board elections.

The Alabama Code, § 16-8-1 (1977), provides that members of county boards of education "shall be elected by the qualified electors of the county." This portion of the statute has remained unchanged since its inclusion in the 1927 Alabama School Code. The Alabama statute permits any city having more than 5,000 population to operate an independent school system if it chooses to do so (§ 16-11-1 and § 16-13-199). City school board members are chosen by the city governing authority (§ 16-11-3), but the Alabama statute is silent on the effect that the establishment of an independent city school system and board of education has upon the electoral process to determine members of the county school boards. Consequently, residents of a city having its own independent school system are not prohibited from voting for county school board members.

This litigation, brought by voters residing in Tuscaloosa County, seeks an injunction preventing residents living within the City of Tuscaloosa from voting for members of the county school board. The City of Tuscaloosa has its own independent school system and city school board. Tuscaloosa County has a population of 116,029, of whom 65,773 (56%) live within the City of Tuscaloosa. There are about 12,00 students in the county system and 11,000 in the city system. Plaintiffs allege that their votes

are diluted by the votes of electors residing in the City of Tuscaloosa. Plaintiffs contend that they are being denied the equal protection of the laws guaranteed by the Constitution.

## JURISDICTION

■ In the district court the case was tried by a single judge, as well as by a special three-judge district court that was convened out of an abundance of caution pursuant to 28 U.S.C. § 2281. Although the constitutionality of a state statute is questioned by this litigation, we determine that this case and this decision do not have state-wide effect. The trial court noted that there are great variations in the law in Alabama with respect to the school systems in the different counties, such as special local legislation, and also great disparity in the facts between the different counties in Alabama. The parties do not dispute this. None of the parties challenges the jurisdiction of this court. We therefore hold that a convening of the three-judge district court was unnecessary, that an appeal to the United States Supreme Court is not required, and that we here review the decision and judgment of the single district court trial judge, thus giving us jurisdiction. 28 U.S.C. § 1291.

## FIFTH CIRCUIT PRECEDENT

Our first consideration in this case is to determine whether the decision in *Creel, supra* note 1, controls our decision here. *Creel* involved the question whether electors residing in the City of Jasper and the City of Carbon Hill could vote for members of the Walker County School Board, both Jasper and Carbon Hill having their own independent school districts and school boards. We first note that the election of members of the school board of Walker County is governed by a special local statute passed in 1965 that pertains to Walker County and its school system only. Thus, the election in *Creel* was not controlled by

1. *Creel v. Freeman*, 531 F.2d 286 (5th Cir. 1976).

the statute at issue in this case.[2] We will next compare the facts in *Creel* pertaining to the relationship of the city and county school systems there to the facts as they existed in Tuscaloosa County, forming the basis of this lawsuit.

In holding that the voters of Jasper and Carbon Hill were entitled to vote for members of the Walker County Board of Education, the *Creel* court, in addition to considering the special statute, considered the following facts in concluding that there was a sufficient interrelationship between the school systems to give the residents of Jasper and Carbon Hill a substantial interest in the operation of the Walker County school system: Jasper paid $100,000 for the purchase of property for the housing of the offices, workshop, and textbook center of the county board and rented the property to the board for $1 a year. The Jasper city school board contributed toward the construction of the Walker Area vocational school which was under the exclusive control of the county board. The county vocational school had 691 students, 114 of whom lived in Jasper, and the Jasper school board paid $50 for each city student attending the vocational school. Walker High School was located in Jasper, and in 1974 had 950 students, 488 of whom lived in the county, and of these 257 were transported to the school by the county board. Of the 965 students in the Carbon Hill School system, 482 lived outside the city limits, and these were transported by buses owned and operated by the county board and were charged no fee for attending the Carbon Hill School. The previously mentioned local statute required the chairman of the county board to be elected by all the voters in the county, and divided the county into four separate districts from which one member was elected by the qualified electors of that district alone. Jasper was located in District 1, and Carbon Hill was located in District 2. In the 1974 election 755 votes were cast by Carbon Hill residents and 1602 by residents of the district outside Carbon Hill to elect that district's member. No breakdown is given for the City of Jasper, but the court notes that in May, 1972, in the countywide election for chairman, 4,161 votes were cast from Jasper and Carbon Hill and 9,339 from the balance of the county. The court notes: "Appellants do not allege that Carbon Hill or Jasper voters dominate the elections in their respective county school districts, much less the countywide elections." 531 F.2d at 287. In deciding that the plaintiffs–appellants were not denied equal protection, this court concluded:

> The facts of this case clearly show a *substantial interest of Jasper and Carbon Hill residents in the operation of the Walker County school system* and do not show domination by such residents over county school board elections. Accordingly, appellants have not met their burden of demonstrating that the Alabama statutes and their application here are irrational or wholly irrelevant to the state's objective of electoral participation in the selection of county school board members.
>
> Moreover, appellants have failed to sustain their burden of showing that their proposed "fencing out" of Jasper and Carbon Hill residents from voting in county board elections is required by a

---

**2.** The State of Alabama apparently concludes also that § 16–8–1 of the Alabama Code was not the controlling statute in deciding *Creel*. The State of Alabama was a party defendant in this litigation. Plaintiffs filed a class action in an attempt to have the statute declared unconstitutional statewide. In opposition to the class action claim the following comment was made by the Assistant Attorney General of Alabama at the trial:

> [Miss Hamlett:] [W]e would oppose any class action against any defendant in this case, set upon the basis of the fact,.I don't think there will be any evidence here to show that this statute is applied statewide in the same manner in other counties. I think that what we have here and what was discovered in the *Creel* case was that the statute is applied differently in different counties based on the tax structures of the county, and how separate school systems were set up in each county.

compelling state interest. [Citations omitted.]

531 F.2d at 288 (emphasis added).

Returning to this case, the court below approached the issue by noting that "[t]he inclusion in the electorate of an identifiable group of voters having no significant interest in the body to be elected would certainly be irrational. Likewise, the attack could be made that the votes of racial minorities are impermissibly diluted, under such cases as *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir. 1973) (en banc), and *Nevett v. Sides*, 533 F.2d 1361 (5th Cir. 1976)." And, as the *Creel* court put it, if the residents of Tuscaloosa have no more interest in the affairs of the county school board than the residents of the next county, "a compelling state interest in excluding them from voting would no doubt exist." 531 F.2d at 288. Our inquiry here then is whether the residents of the City of Tuscaloosa have a substantial interest in the operation of the Tuscaloosa County school system. If they do, then we are bound to conclude, as in *Creel*, that they have a right to vote for the members of the Tuscaloosa County school board. On the contrary, however, if we find such a substantial interest lacking, we must reverse.

## THE RELATIONSHIP OF THE TWO SCHOOL SYSTEMS

The district court concluded that the residents of the City of Tuscaloosa have a substantial interest in the operation of the county school system. We disagree.

As noted by the trial court, both City and County school systems have been the subject of court–ordered desegregation plans which generally preclude the transfer of students, and while there have been some limited exceptions, the number is miniscule. Keeping in mind that in the two school systems there are approximately 23,000 students, the evidence reflected that there were a few "crossovers" where there had been disciplinary problems. After conver-

sations between representatives of the school systems, transfers would be permitted in an effort to assist a particular student. The only other interrelationship in student enrollment pertains to special schools. For example, the county system operates a regional school for multi–handicapped students with an enrollment of 84. This school is financed by funds from the federal and state governments. Students attend from four or five counties surrounding Tuscaloosa County and five to fifteen students from the City of Tuscaloosa attend this school. Both the city and the county have vocational schools, the city school being a regional one. Financing is through federal funds and supplemented by state and local funds.[3] The evidence showed that the county transported four students from its schools to the city vocational school and the county school superintendent testified that a few city students would occasionally come to the county vocational school to obtain classes not offered by the city school. Both school systems offer adult–oriented "community education" courses which are not limited to residents of their respective jurisdiction. The county had 25 or 30 community education classes with an average of about 10 pupils per class. The superintendent did not know how many city residents attended the county courses nor how many county residents attended the city courses. From the point of view of student attendance in the two school systems, we conclude that the systems are operated separately and that the electors residing in the City of Tuscaloosa do not have a significant interest in the county school system.

The trial court apparently determined that the residents of the City of Tuscaloosa have a substantial interest in the election of members of the county board based on findings leading it to conclude that "city residents provide a substantial part of the local tax funds which support the programs of the county board." We come to a different conclusion.

---

**3.** See chapter 37 of Title 16 of the Alabama Code for special provisions on vocational education. That chapter permits city and county boards of education to jointly operate vocational high schools, but this is not done by the two Tuscaloosa school systems.

The budget for the county school system in the year in question was $11 million, 70% of which came from the State of Alabama, 15% from the federal government, and 15% from local funds. Local funding amounted to $1,650,000. Tuscaloosa County has a 2% countywide sales tax, 40% of which goes to the county school system, 40% to the city school system, and 20% to the county hospital. In the year in question both the county and the city received $488,000 from this source. Approximately 56% of the people in the county live in the city, and this led the trial court to conclude that the city people contributed more sales tax money to the county school system than did the county people. The balance of the $1,650,000 in local funds is derived from property taxes, being a four–mill countywide school tax to which is added a district school mill tax for the three school districts that make up the city and county school systems. School districts one and two are in the county, and these districts each had a three–mill tax; the city district had a five–mill tax. The district millage taxes, however, go solely to the systems comprised of those districts, the city district millage taxes going to the city school system and the county districts' millage taxes going to the county system. Thus, only the four–mill countywide school tax is divided between the two systems. The countywide four–mill tax was divided 51% to the county and 49% to the city, and the trial court found that because properties in the city carried higher valuations, approximately $90,000 flowed annually from taxes collected on properties in the city into the county school system.

■ We are unable to agree with the lower court that the revenues found to flow from city residents to the county system create a substantial interest, for purposes of electoral representation, on the part of the city residents in the operation of the system. In the first place, the generation of sales tax revenues, which the lower court found to be "the principal source of local tax support" for the county system, are not conditioned upon the residence or "citizenship" of the purchasers, but depend instead upon the place of purchase. Although the

district court was no doubt correct in inferring that a substantial majority of the county's sales tax revenues are generated in the city, the record fails to disclose how much of this revenue is attributable to purchases made by county residents shopping in the city. In light of the small proportion that the county system's share of the countywide sales tax bears to its operating budget ($488,000 out of an overall budget in excess of $11 million), we cannot conclude that this degree of financial support is sufficient to confer a voter's interest on the city resident. Particularly is this so when "interest" is premised on the source of the funds and yet no effort has been made to distinguish between county residents' and city residents' share of sales tax revenues generated in the city.

Even less so can we find a substantial interest on the part of the city as a result of property taxes levied against city property and allocated to the county system. The district court found that no more than $90,000 in property tax revenues flowed from city sources to county system use, amounting to less than 1% of the county system's budget. We conclude that this measure of support is insufficient to justify the inclusion of so many otherwise disinterested electors as to reduce by over one–half the weight of the votes cast by those who actually reside in the county system's jurisdiction.

We do not decide that any of the lower court's findings of fact are "clearly erroneous," but we do arrive at a different conclusion from those facts. We hold that the facts in this case do not show a substantial interest of City of Tuscaloosa residents in the operation of the Tuscaloosa County School System as was found to exist in *Creel*. Absent such a substantial interest, we conclude that the residents of Tuscaloosa County have had their votes unconstitutionally diluted by the participation of the city electors in choosing the county school board members.

Having reviewed the record carefully and considered our own panel opinion in *Creel*,

**952**

the Supreme Court opinions in *Kramer v. Union Free School District*, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969), *Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60, 99 S.Ct. 383, 58 L.Ed.2d 292 (1978), *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), our own circuit's case in *Nevett v. Sides*, 533 F.2d 1361 (5 Cir. 1976), we conclude that the Alabama statute, which in this case permits electors in the City of Tuscaloosa to vote for members of the Tuscaloosa County school board, impermissibly dilutes the voting strength of the county electors and that the City of Tuscaloosa electors do not have a substantial interest in the election of the county board members that warrants their right to participate.

The judgment is REVERSED, and the case is REMANDED for proceedings consistent with this opinion.

JAMES C. HILL, Circuit Judge, dissenting:

Being persuaded that our panel is bound by the prior resolution of this same issue in *Creel v. Freeman*, 531 F.2d 286 (5th Cir. 1976), I would affirm the judgment of the District Court. While there are some differences in the facts in these two cases, as there are factual differences between any one of our cases and all others, the rule of law laid down in *Creel*, until and unless modified by our Court en banc or by the Supreme Court, should control.

By carving a new facet on the rule, we have now announced that the Constitution permits electors residing in Jasper, Alabama and Carbon Hill Alabama to vote for members of the Walker County School Board (the cities being within that county), but the Constitution prohibits residents of Tuscaloosa, Alabama from voting for members of the Tuscaloosa County School Board! This is said to be so even though both of the school boards are within a single state—Alabama; the sole question is whether or not residents of cities or towns within the county having school districts independent of the county district can vote for members of the county district's school board; and the Constitution to be applied in

each case is the same—the Constitution of the United States.

Judicial work cries out for predictability. Law abiding citizens who want to know the law so that they can abide it ought to be able to read our decisions and have reason to believe how the court views given situations. Dedicated and able members of the bar cannot be expected to know how to advise regarding the election of county school board members in the other 65 counties of Alabama. The panel majority's opinion is an invitation to litigants to bring them all to our court, one at a time, so that successive panels can say who may constitutionally vote for board members of each system.

If *Creel* be decided incorrectly, it should be put right en banc. Until and unless it is, the judgment in this case should be affirmed.